**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ESTATE OF SEAN WILLIAM RHOAD,       :
By and through its Administrator    :
GEORGE WILLIAM RHOAD, JR.           :
                                    :
                v.                  :    CIVIL ACTION
                                    :    No. 05-5875
EAST VINCENT TOWNSHIP,              :
BOROUGH OF SPRING CITY,             :
BOROUGH OF PHOENIXVILLE             :

**MEMORANDUM AND ORDER**

JOYNER, J.                                    **APRIL 18, 2006**

Presently pending before the Court are the motions of the
Defendants, East Vincent Township and Borough of Spring City, for
dismissal of Plaintiff's complaint. For the reasons set forth
below, the motions shall be granted in part and denied in part.

**History of the Case**

Plaintiff in this case is the Estate of Sean William Rhoad
("Rhoad"), Deceased, by and through its Administrator, George
William Rhoad, Jr. Plaintiff alleges that Rhoad's constitutional
rights were violated by Defendant-Municipalities throughout his
cooperation as an informant with their respective police
departments. The factual allegations of this complaint are as
follows: On July 22, 2002, Rhoad was arrested by the Spring City
Police Department for possession of a controlled substance and
drug paraphernalia, and as a result was required to enter the

Horsham Clinic for his drug addiction. (Complaint, ¶¶ 9-10). On
or about August 5, 2002, after Rhoad's release from the Horsham
Clinic, a representative of the Spring City Police Department
approached and compelled him to assist the department with
ongoing investigations in the Spring City area. (Complaint, ¶
11). Around this time, Rhoad's father informed Chief Roman of the
Spring City Police Department that his son was not physically or
psychologically prepared to deal with this work. (Complaint, ¶
14). On August 6, 2002, Rhoad was interviewed for a second time
by representatives of the Phoenixville Police Department; he was
also interviewed by representatives of the Chester County
Municipal Drug Task Force ("CCMDTF"), an entity with which all
Defendants were participating regarding Rhoad's cooperation.
(Complaint, ¶¶ 15, 17).

      Throughout this time, Rhoad's drug addiction was increasing.
(Complaint, ¶ 19).  He eventually approached Officer Eckman of
the Phoenixville Police Department, his contact with the CCMDTF,
and requested that he be permitted to cease his cooperation and
enter drug rehabilitation; he was denied. (Complaint, ¶ 20). From
September 3, 2002 through September 16, 2002, Rhoad repeatedly
pled for permission to enter a treatment facility and was at all
times denied by representatives of Defendants. (Complaint, ¶¶ 21,
24). On or about September 17, 2002, Rhoad committed suicide.

2

(Complaint, ¶ 25).

Plaintiff asserts that Rhoad's actions and appearance made it clear that he was a harm to himself and that the officers, agents, and employees of Defendants who came in contact with him knew or should have known that he was capable of self-inflicted harm. (Complaint, ¶ 29). Plaintiff further alleges that the Defendants' failure to intervene, monitor, or prevent Rhoad from proceeding with his clear intention to do harm to himself, as well as their failure to secure him drug, psychiatric, or medical treatment, directly resulted in his suicide. (Complaint, ¶ 30).

Plaintiff commenced this action on November 8, 2005 alleging that the Defendants deprived Sean William Rhoad of his substantive due process rights afforded to him under the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983 ("§ 1983"). More specifically, Plaintiff alleges that the Defendants are at fault under several theories of § 1983 liability, including: (1) unconstitutional policy or custom, including the failure to train; (2) state-created danger; and (3) special relationship. Plaintiff also alleges that Defendants are liable for wrongful death. It is these claims which Defendants now seek to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6). It must further be noted that based on the similar nature of Plaintiff's claims against each Defendant, in addition to the Defendants' nearly identical

3

responses to such, that Defendants' motions to dismiss will be treated together for purposes of this memorandum and order.

## Standards Applicable to Rule 12(b)(6) Motions

As a general rule, when considering motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the district court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." Allah v. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000) (internal quotations omitted). A motion to dismiss may only be granted where the allegations fail to state any claim upon which relief may be granted. See Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). The inquiry is not whether a plaintiff will ultimately prevail in a trial on the merits, but whether the plaintiff should be afforded an opportunity to offer evidence in support of his claims. In re Rockefeller Ctr. Props., Inc., 311 F.3d 198, 215 (3d Cir. 2002). Dismissal is warranted only "if it is certain that no relief can be granted under any set of facts which could be proved." Klein v. General Nutrition Cos., 186 F.3d 338, 342 (3d Cir. 1999) (internal quotations omitted). It must be noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint and legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. In re Rockefeller, 311 F.3d at 216.

4

**Discussion**

**I.   Plaintiff's Claims Under 42 U.S.C. § 1983**

The threshold question in any § 1983 case is whether the plaintiff has alleged a deprivation of a right protected by the Constitution and whether the deprivation was committed by a person acting under the color of state law. Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995). Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C.A. § 1983 (2003). The statute creates no substantive rights. Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 477 (3d Cir. 2003).  It only acts as a means to provide remedies for violations of rights secured under the Constitution or federal laws. Id. Instantly, Plaintiff alleges that the Borough of Spring City and East Vincent Township violated Rhoad's substantive due process rights protected by the Fourteenth Amendment, including his right to be secure in his person.(Complaint, ¶¶ 33, 36).

5

As a general rule, the Due Process Clause of the Fourteenth Amendment does not require state actors to protect citizens from the violence of private actors or themselves. DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 195, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989); Estate of Henderson v. City of Phila., No. 98-3861, 1999 U.S. Dist. 10367, at *14 (E.D. Pa. July 12, 1999). In DeShaney, the Court addressed whether the state deprived a child of his liberty interest in "free[dom] from... unjustified intrusions on personal security" after a county's department of social services failed to protect the child from continued physical abuse from his father. 489 U.S. at 195. The Court found:

> [T]he Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

Id. at 196-97. Despite this language, the Court went on to note that a special relationship could exist between the state and a private individual that would impose an affirmative duty of care and protection on the state. Id. at 199-201. In dicta, the Court also alluded to the possibility that another exception may exist even in the absence of such a relationship. Id. at 201. The Third

6

Circuit later recognized this exception in its approval of the state-created danger theory of liability. See Kneipp by Cusak v. Tedder, 95 F.3d 1199 (3d Cir. 1996).

>    **A.   Special Relationship**

Defendants move for the dismissal of Plaintiff's claim in Count II, which seeks to impose liability under the special relationship theory because Rhoad was not in custody of the Defendants when he committed suicide.

Under the special relationship exception, a state actor may be held liable "when the state enters into a special relationship with a particular citizen... [and] fails, under sufficiently culpable circumstances, to protect the health and safety of the citizen to whom it owes an affirmative duty." Morse, 132 F.3d at 907 (quoting D.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1369 (3d Cir. 1992)). As the Supreme Court noted in DeShaney, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." 489 U.S. 189, 200. The Third Circuit has read this to require physical custody. D.R., 972 F.2d at 1370. Furthermore, courts have found that no special relationship exists when the plaintiff voluntarily places himself in the custodial relationship with the state. See Fialkowski v. Greenwich Home for Children, Inc., 921

7

F.2d 459, 465-66 (3d Cir. 1991); <u>Shalley v. City of Phila.</u>, No. 94-5883, 1995 WL 770819, at *4 (E.D. Pa. Dec. 27, 1995).

In <u>G-69 v. Degnan,</u> the court addressed whether the special relationship doctrine applied to informants. <u>See</u> 745 F. Supp. 254, 262-63 (D. N.J. 1990). There, the plaintiff-informant's secret identity was discovered and he claimed that the state, based on the parties' special relationship, owed him protection and a new identity. The court found that a special relationship could exist when both parties anticipate that, if discovered, the informant's cooperation could lead to a threat of that person's life and the state offers guarantees of certain protections if such an event were to occur. <u>Id</u>. at 265. It concluded that once the state guarantees the informant certain protections it cannot, consistent with the Constitution, avoid such promises. <u>Id</u>.

Here, the Plaintiff has failed to allege that the state and Rhoad were in a special relationship creating an affirmative duty on the state to protect Rhoad from harming himself. While it is reasonable to infer that the officers' repeated denials of Rhoad's requests to enter treatment until he finished his cooperation effectively, or constructively, restrained Rhoad from seeking help on his own, there is no allegation that Rhoad was in physical custody as required under Third Circuit jurisprudence. (Complaint, ¶¶ 20, 21, 24). In addition, there is no allegation that Rhoad's cooperation with the officers was a result of

8

anything but his own volition. Also, unlike G-69, here the harm
which befell Rhoad did not result from anticipated activities
while he was acting in his capacity as an informant; rather, they
resulted from his own actions, which were collateral to his
cooperation. Accordingly, Plaintiff has failed to establish that
Defendant and Rhoad were in a special relationship.

For the reasons stated above, Defendants' motions to dismiss
Count II are Granted.

**B.   State-Created Danger**

Defendants move for dismissal of Plaintiff's claim in Count
III under the state-created danger theory of liability because
Rhoad's suicide was neither foreseeable nor did the police
officers use their authority to create an opportunity for its
commission to occur.

In Kneipp, the Third Circuit formally adopted the state-
created danger theory of liability. See 95 F.3d 1199. There,
Samantha Kneipp and her husband were stopped by police officers
while walking home from a bar on a cold January night. Id. at
1201. The officers allowed Samantha's husband to continue home to
check on their babysitter while keeping her behind. Id. at 1202.
Samantha was visibly intoxicated and reliant on her husband to
walk, yet the officers eventually left allowing her to walk home
on her own. Id. She never arrived home and was later found lying
unconscious on the side of the road. Id. at 1203. As a result of

9

the cold, she suffered hypothermia, which caused severe brain damage. Id. The circuit court reversed the district court's finding of summary judgment for defendants. It found the defendant state actors could be liable under the state-created danger theory if:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

Kneipp, 95 F.3d at 1208 (quoting Mark, 51 F.3d at 1152). The court concluded that a reasonable jury could find that the officers used their authority to create a dangerous situation by increasing the risk to Samantha. Kneipp, 95 F.3d at 1209.

In Morse, the Third Circuit again discussed the state-created danger theory applying the same four-part test. See 132 F.3d. 902. There, private contractors working on a school building in the Lower Merion School District would often prop open a back door to ease their access into the building. Id. at 904. The school district unlocked the back door for the workers in violation of its policy to keep all side and back doors locked at all times. Id. One day, a mentally ill resident entered the back door and murdered a teacher. Id. The Third Circuit found that the plaintiffs, the estate of the teacher, failed to state a

10

claim based on the state-created danger theory. It held as a matter of law that the defendants could not have foreseen that unlocking the door would result in the commission of a murder by a local resident. Id. at 908.

In Estate of Henderson, the district court addressed the state-created danger theory in a manner instructive for purposes of this motion to dismiss. See 1999 U.S. Dist. LEXIS 10367. There, Donna Henderson intended to involuntarily commit her mentally ill son Salim for psychological treatment because she feared that his illness made him a danger to himself. Id. at *3. After contacting 911, two officers were dispatched to her home to transport Salim to the hospital. Id. When they arrived at the Henderson home, the officers received papers from Donna Henderson authorizing her son's commitment. Id. at *5. While the officers were reading the papers, Salim Henderson ("Salim") came downstairs. Id. He explained to his mother that he knew why the officers were there and that he did not want to go to the hospital. Id. He then told everyone that he needed to go upstairs for something, which the officers allowed him to do without restraint. Id. When he was out of "earshot," Donna Henderson told the officers that Salim might jump out of the window. Id. Shortly thereafter, there was a loud noise. Id at *6. Salim was found to have jumped out of the second-story window causing him severe and permanent injuries. Id. As explained in greater detail below, the

11

court found that the plaintiff failed to produce sufficient evidence to survive summary judgment on the fourth prong of the Kneipp test. <u>Id</u>. at 31.

### 1.   Sean William Rhoad's Harm was Foreseeable and Fairly Direct

The court must determine whether Rhoad's suicide was a foreseeable harm that was a fairly direct result of Defendant's actions or lack thereof. <u>See</u> <u>Morse</u>, 132 F.3d at 902; <u>Estate of Henderson</u>, 1999 U.S. Dist. LEXIS 10367, at *21. After a detailed analysis of Third Circuit jurisprudence on foreseeability in the state-created danger context, the court in <u>Gremo v. Karlin</u>, 363 F. Supp. 2d 771, 784 (E.D. Pa. 2005) wrote, "a harm is foreseeable when a state actor has actual awareness, based on concrete information, of a risk of harm to an individual... such that the actor is on notice that his or her act or failure to act significantly enhances the risk of harm. "

In <u>Estate of Henderson</u>, the district court was required to make a fact intensive analysis of the alleged incident to determine if the victim's harm was foreseeable. It found that Salim's attempted suicide was, in fact, foreseeable because the officers were provided with papers indicating that Salim was a danger to himself, they were aware he did not want to go to the hospital, and they were told by his mother that he may jump out of the second-story window. <u>Id</u>. at *23. The court also found Salim's harm a fairly direct result of the officers' failure to

12

act because they did nothing to control his actions three to four minutes after his mother's warnings. <u>Id</u>.

Presently, Plaintiff has sufficiently alleged that the decedent's suicide was foreseeable and a fairly direct result of the officers' actions or lack thereof. First, the complaint alleges that the officers and other agents and employees of Defendants, through their contact with Rhoad, knew or should have known that he was capable of self-inflicted harm. (Complaint, ¶ 29). It further asserts that upon commencement of his cooperation with the CCMDTF, an entity with which all Defendants were allegedly working, Rhoad's father warned Chief Roman of the Spring City Police Department that his son was not psychologically prepared to assist the officers in their investigations. (Complaint, ¶¶ 14, 15, 17). While this warning was not as specific as Denise Henderson's as to the harm that faced her son in <u>Estate of Henderson</u>, when coupled with other factual allegations, the inference can be drawn that the officers should have been aware that Rhoad posed a serious risk of harm to himself. For example, while in the control of the officers, Rhoad "outwardly manifested his... mental health condition." (Complaint, ¶ 28). In addition, his actions and appearance further displayed his psychological decomposition. (Complaint, ¶ 29). Taking these allegations as true, Plaintiff has adequately pled that the officers had notice of Rhoad's deteriorating mental

13

condition making his suicide foreseeable. See Kneipp, 95 F.3d 1199 (finding that the officers' awareness of the victim's intoxicated condition made it foreseeable that she would suffer harm if left alone on the side of the road in the cold).

Plaintiff has also sufficiently pled that Rhoad's suicide was a fairly direct result of the officers' actions or lack thereof. Here, the complaint alleges that the officers failed to protect Rhoad from the harm that he posed to himself. It also alleges that the officers repeatedly denied his pleas to enter rehabilitation on his own while at the same time compelling his continued cooperation with their investigations. (Complaint, ¶¶ 20-22, 24). Like the officers' inaction after Denise Henderson's warnings in Estate of Henderson, here the officers were on notice of the risk of harm Rhoad posed to himself yet did nothing to prevent the risk from materializing. Instead, the officers affirmatively denied Rhoad's repeated pleas to enter rehabilitation. These acts and omissions helped to ultimately precipitate his suicide.

### 2. The State Actors Acted in Willful Disregard for Sean William Rhoad's Safety

The court must next determine whether the officers acted with willful disregard for Rhoad's safety. See Kneipp, 95 F.3d at 1208; Estate of Henderson, 1999 U.S. Dist. LEXIS 10367, at * 25. To do so, "[t]he environment created by the state actors must be dangerous; they must know it to be dangerous; and ... [they] must

14

have at least been deliberately indifferent." Morse, 132 F.3d at 910 (quoting Johnson v. Dallas Indep. Sch. Dist., 38 F.3d 198, 201 (5th Cir. 1994)).  Stated differently, the harm must have been foreseeable to the state actors and the "state's actions must evince a willingness to ignore [that] foreseeable danger or risk." Morse, 132 F.3d at 910.

In Estate of Henderson, the court held that a reasonable jury could find that based on Donna Henderson's warnings, the officers knew Salim was in imminent danger and did nothing to protect him. 1999 U.S. Dist. LEXIS 10367, at * 26-27. In other words, "their decision to continue reviewing [his commitment papers] in the face of potentially imminent danger was deliberately indifferent to [his] safety." Id. at *27. In Morse, the court found the defendants could not have been aware of the danger posed by the mentally ill resident, nor could they have foreseen it; and, therefore, as a matter of law it held defendants did not act with willful disregard to the victim's safety. 132 F.3d at 910. Finally, in Kneipp, the court "focused on the police officers' decision to send Samantha Kneipp home alone, despite their awareness of her intoxicated and incapacitated state, as evidence of their deliberate indifference." Id. at 910 (analyzing the holding in Kneipp, 95 F.3d 119).

Plaintiff has sufficiently alleged that the officers acted

15

in willful disregard for Sean Rhoad's safety. As aforementioned, Rhoad's father's assertions to Chief Roman concerning his son's condition, coupled with Rhoad's appearance and outward manifestations of his mental decomposition, created awareness among the officers of the danger of harm Rhoad posed to himself. (Complaint, ¶¶ 14, 28-29). Despite this knowledge, the officers continued to compel Rhoad's cooperation with their investigations while denying his repeated pleas to seek rehabilitation for his drug dependency and psychological ailments. (Complaint, ¶¶ 21-22). Similar to the cases of <u>Kneipp</u> and <u>Estate of Henderson</u>, here the officers failed to address the apparent dangers Rhoad posed to himself evidencing deliberate indifference to his safety.

### 3.    There Existed Some Relationship between the State and Sean William Rhoad

The court must next determine whether there existed some relationship between the state and Rhoad. In <u>Kneipp</u>, the court noted that this relationship requires "some contact such that the plaintiff was a foreseeable victim in the tort sense." 95 F.3d at 1209 n. 22. Described as the "foreseeable plaintiff prong," it requires a plaintiff to establish that "the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." <u>Morse</u>, 132 F.3d at 913.

In <u>Estate of Henderson</u>, the court found that some relationship existed between Salim Henderson and the defendants

16

in that he was a foreseeable victim of the officer's failure to restrain his actions. 1999 U.S. Dist. LEXIS 10367, at *30. It reasoned that "because Henderson's injuries resulted from foreseeable harm and because the officers were warned that he may injure himself in precisely the manner he did, Henderson was clearly a foreseeable victim of the officers' inaction." Id. at 31.

Plaintiff has adequately alleged that Rhoad was a foreseeable victim of both the officers' denials of his requests to seek psychological treatment and their inaction to seek treatment on his behalf. Like Estate of Henderson, here the danger Rhoad posed to himself was foreseeable. While it is not alleged the officers were aware of the exact manner in which he would harm himself, and were not present when he did so, they were still on notice that he posed a risk to his own safety. Therefore, Rhoad was an arguably foreseeable victim of the officers' acts and omissions.

### 4. The State Actors used their Authority to Create the Opportunity for Sean William Rhoad's Suicide

The court must finally determine whether the officers "used their authority to create an opportunity that otherwise would not have existed" for Rhoad to commit suicide. Kneipp, 95 F.3d at 1208. As the court in Morse noted, whether an affirmative act is required and what constitutes such an act is less than clear. 132 F.3d at 914. The court, however, determined that the "dispositive

17

factor is whether the state has placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission." <u>Id</u>. at 915.

Courts within the Third Circuit and Eastern District of Pennsylvania have found causation under the state-created danger theory when the state's intervention or lack thereof has increased the risk of harm to the plaintiff or subjected the plaintiff to harm nonexistent before such an act or omission. <u>Sanford v. Stiles</u>, No.03-CV-5698, 2004 WL 2579738, at *4 (E.D. Pa. Nov. 10, 2004); <u>Estate of Henderson</u>, 1999 U.S. Dist. LEXIS 10367, at *34. <u>See</u>, <u>e.g.</u>, <u>Kneipp</u>, 95 F.3d at 1209 (finding officers increased the risk of harm to the intoxicated plaintiff by separating her from the private aid of her husband); <u>Gremo</u>, 363 F. Supp. 2d 771 (concluding that the defendants placed the plaintiff, a student severely beaten by classmates, in a more dangerous position by failing to monitor unsafe common areas in the school and concealing past reports of attacks rather than taking appropriate steps to address the violence); <u>Sciotto v. Marple Newtown Sch. Dist.</u>, 81 F. Supp. 2d 559, 565 (E.D. Pa. 1999) (holding that the school increased the risk of harm to the plaintiff, a student wrestler, by encouraging and compelling wrestlers of a heavier weight class to wrestle lighter, younger high school wrestlers). <u>But</u> <u>see</u>, <u>Morse</u>, 132 F.3d at 915-16

18

(rejecting the plaintiff-teacher's state-created danger claim against the school district because her murder by a mentally unstable resident was not a foreseeable consequence of unlocking the rear door of the school in which plaintiff worked and because she could not prove "that defendants placed [her] in a dangerous environment stripped of means to defend [herself] and cutoff from sources of aid"); Estate of Henderson, 1999 U.S. Dist. LEXIS 10367, at *34-36 (rejecting the plaintiff's state-created danger claim against police officers because his mother's intention to involuntarily commit him to a mental hospital, and not the officers' arrival at his home to transport him there, increased the risk that he would attempt to harm himself by leaping from a second-story window and because the officers did nothing to remove his private sources of aid).

It must first be noted that Plaintiff's complaint is replete with allegations that upon commencement of Rhoad's cooperation, Defendants had a duty to evaluate his drug dependency and psychological needs and offer him care and protective services in the form of drug rehabilitation and psychiatric help. (Complaint, ¶¶ 50-52). It is further alleged that, by failing to take adequate actions to protect Rhoad from himself, the officers effectuated a state-created danger. (Complaint, ¶ 52). While the officers' failures to act may be viewed as omissions that are actionable under Morse, DeShaney makes it clear that there is no

duty on the state to protect citizens from the violence of private actors or themselves. See DeShaney, 489 U.S. at 195; Morse, 132 F.3d at 915. Therefore, this Court must look elsewhere in the complaint to determine if Plaintiff has established the fourth prong of the Kneipp test.

Plaintiff has adequately pled that the officers placed Rhoad in a position of foreseeable danger as to satisfy the fourth prong of the Kneipp test.  The officers both isolated Rhoad from private sources of aid and increased the risk of danger he posed to himself. For instance, Plaintiff has alleged that during Rhoad's cooperation, his drug dependency was increasing and that he outwardly manifested his mental health decomposition. (Complaint, ¶¶ 14, 28). Plaintiff has also alleged that Rhoad repeatedly requested that the officers allow him to cease assisting them in order to enter appropriate rehabilitative treatment. (Complaint, ¶ 21). Despite his pleas, the officers refused, instead requiring him to continue his cooperation before he could do so. (Complaint,¶¶ 20, 21, 24). These proscriptions isolated Rhoad from private sources of aid for his drug dependency and psychological problems. While it is not alleged that Rhoad was in custody or physically restrained from seeking help on his own, it is reasonable to infer that the officer's constant denials of his requests constructively prevented him from doing so. Consequently, without treatment, the danger

20

Rhoad's mental decomposition posed to his own safety increased, ultimately manifesting into his commission of suicide. For these reasons, the causal relationship between the officers' actions and Rhoad's suicide is sufficient to satisfy the fourth prong of the Kneipp test.

While Plaintiff has sufficiently pled that Defendants may have effectuated a state-created danger, the inquiry does not stop here. Plaintiff must further allege that "some municipal policy or custom caused the underlying constitutional violation by state actors under the state-created danger theory..." M.B. v. City of Phila., No. 00-5223, 2003 U.S. Dist. LEXIS 2999, at * 19 (E.D. Pa. Mar. 3, 2003). Although some district courts reject this layered analysis and treat policy and custom claims separately from state-created danger claims, based on the Supreme Court's holding in Monell v. City of New York Dep't of Soc. Servs., 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018, this Court is compelled to favor the former approach. In Monell, the Court found that municipalities could not be held vicariously liable for constitutional violations committed by their agents or employees unless the agents or employees were acting pursuant to a municipal policy or custom. Id. at 690.  Therefore, it follows that municipalities cannot be held vicariously liable for a state-created danger violation committed by their agents or employees unless the agents or employees were acting pursuant to

21

a municipal policy or custom.

   C.   **Policy or Custom**

   As aforementioned, a municipality cannot be held liable

solely on the basis of its employees' or agents' actions under

the doctrine of *respondeat superior*. <u>Bd. of County Comm'rs of

Bryan County v. Brown</u>, 520 U.S. 397, 403, 137 L. Ed. 2d 626, 117

S. Ct. 1382, 1388 (1997). Rather, a municipality may only be held

liable where the actions of its agents or employees are committed

pursuant to some policy or custom. <u>Monell</u>, 436 U.S. at 690.

Policy and custom have been defined and distinguished as follows:

> Policy is made when a 'decisionmaker possessing final
> authority to establish municipal policy with respect to
> the action' issues an official proclamation, policy, or
> edict. A course of conduct is considered to be a
> 'custom' when, though not authorized by law, 'such
> practices of state officials [are] so permanent and
> well-settled  as to virtually constitute law.

<u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d Cir. 1996)

(quoting <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1480 (3d Cir.

1990)(citations omitted). Custom may also be established by

showing a policymaker's knowledge and acquiescence to a practice.

<u>Id</u>. Once a policy or custom has been established, it must also be

shown that the policy or custom was the "moving force" behind the

alleged injury. <u>Bryan County</u>, 520 U.S. at. 403.

   In <u>City of Canton v. Harris</u>, 489 U.S. 378, 388, 103 L. Ed.

2d 412, 109 S. Ct. 1197 (1989), the Court found that inadequate training may also serve as the basis for § 1983 policy or custom liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Failure to adequately train municipal employees "can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000)(citing Bryan County, 520 U.S. at 408-09). However, the Supreme Court has not foreclosed the possibility that a single violation of constitutional rights arising from a municipality's failure to train its employees to handle recurring situations could impose liability. See Bryan County, 520 U.S. at 409 (citing Harris, 498 U.S. at 390, n. 10).

Plaintiff has adequately alleged that Defendants, through their policies and customs, including their failure to train their police personnel, violated Rhoad's constitutional rights to substantive due process. Plaintiff has averred that the Defendants failed to train their employees concerning the safety and psychological needs of persons in their control and that their policies and customs demonstrated deliberate indifference to the safety and mental needs of Rhoad and those similarly situated (Complaint, ¶¶ 32, 34). Plaintiff has also established causation by asserting that these policies and practices resulted

23

in the death of Rhoad. (Complaint, ¶ 34). In addition, Plaintiff has pled that the Defendants' conduct manifested deliberate indifference for, among other reasons, failing to administer to Rhoad's mental health needs after his request for rehabilitation and by failing to adequately train police personnel regarding "suicidal behavior/ideation." (Complaint, ¶¶ 34(b), (d)). To conclude, Plaintiff has adequately pled that Defendants may be liable for the violation of Rhoad's constitutional rights arising from unconstitutional policies or customs, including Defendants' failure to train.

For the reasons stated above, Defendants' motions to dismiss Counts I and III are Denied.

## II.  Wrongful Death

Plaintiff's final count (Count V) seeks to impose liability upon Defendants under a state law claim for wrongful death pursuant to 42 Pa. C.S.A. § 8301.

Under the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. C.S.A. §§ 8541-8564, local agencies are generally immune from tort liability. Estate of Brian Sullivan v. Geo Group, Inc., No. 05-5354, 2005 U.S. Dist. LEXIS 33155, at * 3 (E.D. Pa. Dec. 15, 2005). The act provides, *inter alia*, that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local

24

agency or an employee thereof or any other person." 42 Pa. C.S.A.
§ 8541. It enumerates eight exceptions where a municipality may
be liable for negligent acts resulting in injury to persons.
These include:

> (1) vehicle liability; (2) care, custody or control
> of personal property; (3) care, custody or control of
> real property; (4) dangerous conditions of trees,
> traffic signs, lights, or other traffic controls,
> street lights or street lighting systems under the
> care, custody or control of the local agency; (5) a
> dangerous condition of utility service facilities owned
> by the local agency; (6) a dangerous condition of
> streets owned by the local agency; (7) a dangerous
> condition of the sidewalks owned by the local agency;
> and (8) the care, custody or control of animals.

42 Pa. C.S.A. § 8542. The immunity conferred by the Act does not
protect state entities from federal claims. Wade v. City of
Pittsburgh, 765 F.2d 405, 407 (3d Cir. 1985).

Plaintiff has failed to allege that the Defendants' acts
fall within any of the enumerated exceptions; therefore, the
Defendants are immune from Plaintiff's wrongful death claim.

For the reasons stated above, Defendants' motions to
dismiss Count V are Granted.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ESTATE OF SEAN WILLIAM RHOAD,       :
By and through its Administrator :
GEORGE WILLIAM RHOAD, JR.           :
              v.                    :   CIVIL ACTION
EAST VINCENT TOWNSHIP,              :   No. 05-5875
BOROUGH OF SPRING CITY,             :
BOROUGH OF PHOENIXVILLE             :


ORDER


        AND NOW, this   18th  day of April, 2006, upon consideration
of Defendants, East Vincent Township and Borough of Spring City's
Motions to Dismiss Plaintiff's Complaint, it is hereby ORDERED
that the Motions are GRANTED in part and DENIED in part in
accordance with the rationale set forth in the preceding
Memorandum Opinion, and Counts II and V of the Plaintiff's
Complaint are DISMISSED.


                              BY THE COURT:




                              s/J. Curtis Joyner
                              J. CURTIS JOYNER, J.