**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ESTATE OF SEAN WILLIAM RHOAD, : CIVIL ACTION
Dec'd, by and through its     :
Administrator, GEORGE WILLIAM  :
RHOAD, JR.                     : NO. 05-CV-5875
                               :
          vs.                  :
                               :
EAST VINCENT TOWNSHIP,         :
BOROUGH OF SPRING CITY and     :
BOROUGH OF PHOENIXVILLE        :

**MEMORANDUM AND ORDER**

**JOYNER, J.**                              **April   10, 2007**

The three defendants in this case now move for the entry of
summary judgment in their favor on the two claims remaining
against them in the plaintiff's complaint.  For the reasons set
forth in the paragraphs which follow, the motions shall be
granted.

**Factual Background**

This case arose out of the tragic suicide of 23-year-old
Sean William Rhoad on September 17, 2002.  In late July, 2002,
Sean Rhoad ("Sean") had been arrested by Officer Kohl of the
Spring City Police Department for possession of a controlled
substance and drug paraphernalia after his father, the plaintiff
here, contacted the police to advise them that he was taking
possession of his son's truck because he was afraid that he would
use it to buy drugs.  Following his arrest and in lieu of bail

and part of a family intervention, Sean was admitted for one week of in-patient drug rehabilitation at the Horsham Clinic. Approximately one week after his release, he contacted Spring City Police Chief Dee Sherman expressing a desire to re-purchase his grandfather's shotgun which he had sold in exchange for drugs.  Chief Sherman suggested that he come down to the Police Department to talk to her and Sean did so.  Chief Sherman then contacted Officer Mossman from the Phoenixville Police Department and they began to discuss Sean's cooperation as a confidential informant with what the plaintiff eventually learned was the Chester County Municipal Drug Task Force.

Sean acted as a confidential informant for the Task Force for approximately one month.  During that time, he provided valuable information about the drug ring from whom he had regularly purchased drugs and to whom he had given his grandfather's shotgun, conducted several "controlled" purchases of cocaine and crack cocaine and introduced undercover Officer Lund from the West Whiteland Township Police Department to the members of the drug ring.  His assigned Task Force contact or "handler" was Officer Glen Eckman of the Phoenixville Police Department.

Beginning in or around early September, 2002, Sean was again being tempted by drugs and felt that he could no longer continue working as a confidential informant.  According to members of his

2

family, Sean had been forced on at least one occasion to use drugs during one of the "controlled buys" and at that point felt that he couldn't continue as a confidential informant.  He apparently began using drugs again and told Officer Eckman that he needed to quit his Task Force work and go to a rehab facility in New England.  Officer Eckman, however, was unsympathetic and told Sean that after he finished the job, they would get help for him.  Sean's father and mother both tried on several occasions to speak and/or meet with Eckman, but Eckman apparently refused, feeling it was unnecessary as Sean was over the age of 18. Because he had an upcoming hearing scheduled on his possession charges and a condition of his bail was that he could not leave the state, Sean and his parents believed that it was necessary to secure the cooperation of the police department.  Shortly afterward, Sean was "pistol whipped" by one of the members of the drug ring who thought he had stolen money and his father placed a phone call to the District Justice before whom his son's criminal charges were pending to see if he could get the bail conditions modified himself so that Sean could enter an out-of-state treatment facility.  However, a few days later and before that could be arranged, Sean Rhoad committed suicide.

Sean's father, as the Administrator of his Estate, commenced this action originally in the Court of Common Pleas of Chester County, under 42 U.S.C. §1983 and various theories of state tort

law.  The action was removed to this Court in November, 2005 and Defendants' motions to dismiss were partially granted via our Memorandum and Order of April 18, 2006.  Remaining at issue are Plaintiff's claims that the Boroughs of Phoenixville and Spring City and East Vincent Township violated Sean Rhoad's substantive right to due process under the Fourteenth Amendment to the U.S. Constitution under the "state created danger" and failure to train theories of liability.  Again, as with the motions to dismiss, all three motions for summary judgment are substantively the same and shall be treated identically for purposes of our analysis in this Memorandum Opinion.

<u>**Summary Judgment Standards**</u>

It is recognized that the underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. <u>Goodman v. Mead Johnson & Co.</u>, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 50 L. Ed. 2d 748, 97 S. Ct. 732 (1977). Under Fed.R.Civ.P. 56(c), summary judgment is properly rendered:

> "...if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Stated more succinctly, summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-32, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); <u>Oritani Savings & Loan Association v. Fidelity & Deposit Company of Maryland</u>, 989 F.2d 635, 638 (3rd Cir. 1993); <u>Troy Chemical Corp. v. Teamsters Union Local No. 408</u>, 37 F.3d 123, 125-126 (3rd Cir. 1994); <u>Arnold Pontiac-GMC, Inc. v. General Motors Corp.</u>, 700 F. Supp. 838, 840 (W.D. Pa. 1988). An issue of material fact is said to be genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Thus, if the non-moving party bears the burden of persuasion at trial, "the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006), quoting <u>Wetzel v. Tucker</u>, 139 F.3d 380, 383, n.2 (3d Cir. 1998).

## <u>Discussion</u>

Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws; it does not by

its own terms, create substantive rights.  <u>Kaucher</u>, 455 F.3d at
423, citing <u>Banker v. McCollan</u>, 443 U.S. 137, 145 n.3, 99 S.Ct.
2689, 61 L.Ed.2d 433 (1979).  The threshold questions presented
by any §1983 case are whether a plaintiff has sufficiently
alleged a deprivation of a right secured by the Constitution and
whether the deprivation was committed by a person acting under
color of state law.  <u>Brown v. Commonwealth of Pennsylvania
Department of Health Emergency Medical Services Training
Institute</u>, 318 F.3d 473, 476 (3d Cir. 2003); <u>Mark v. Borough of
Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995).

In this case, the gravamen of the plaintiff's complaint is
that the defendants violated his decedent's rights to substantive
due process under the Fourteenth Amendment by failing to
intervene, monitor or prevent him from harming himself when they
knew or should have known that he was in danger of doing so
and/or by interfering with his and his family's efforts to obtain
help for him.  But while the Fourteenth Amendment's Due Process
Clause provides in pertinent part that "[n]o State shall make or
enforce any law which shall abridge the privileges or immunities
of citizens of the United States; nor shall any State deprive any
person of life, liberty, or property, without due process of
law...," there is nothing in the language of the Due Process
Clause itself that requires the State to protect the life,
liberty, and property of its citizens against invasion by private

actors or to impose upon it an affirmative obligation to ensure that those interests do not come to harm through other means. DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989).

However, the Supreme Court has acknowledged that "it is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." DeShaney, 489 U.S. at 198, 109 S.Ct. at 1004.   Thus,

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.   (citations omitted). The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

DeShaney, 489 U.S. at 200, 109 S.Ct. at 1005-1006, citing Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

In its 1996 decision in Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996), the Third Circuit found that sufficient limited circumstances to impose such an affirmative duty of care upon the State existed where city police officers had stopped to question a husband and his severely intoxicated wife while they were walking home from a local bar.   The officers permitted the

7

husband to continue home alone to relieve the couple's babysitter
and then subsequently released the wife to continue on alone.
She was found several hours later at the bottom of an embankment
next to a parking lot at the shopping plaza across the street
from her home.  As a result of her injuries and hypothermia, she
suffered severe permanent brain damage.  In concluding that the
city's and its officers' affirmative acts of isolating Mrs.
Kneipp from her husband and then abandoning her gave rise to a
viable §1983 claim under the "state created danger" theory, the
Court applied the following four factor test that had first been
suggested in Mark, supra.  Specifically, it then found that the
pre-requisite elements had been shown: (1) the harm ultimately
caused was foreseeable and fairly direct; (2) the state actor
acted in willful disregard for the safety of the plaintiff or
with a degree of culpability that shocks the conscience; (3)
there existed some relationship between the state and the
plaintiff such that the plaintiff was a foreseeable victim of the
defendant's acts, or a member of a discrete class of persons
subjected to the potential harm brought about by the state's
actions, as opposed to a member of the public in general; and (4)
the state actors affirmatively used their authority to create a
danger to the citizen or that rendered the citizen more
vulnerable to danger than had the state not acted at all.  Bright
v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006); Kneipp,

95 F.3d at 1208-1209.

In the intervening years between 1996 and the present, subsequent Supreme Court and Third Circuit decisions have made it clear that the standard of culpability to be applied in cases alleging substantive due process violations in general and under the state created danger theory in particular varies depending upon the circumstances confronting those acting on the state's behalf and the extent to which a state actor is required to act under pressure. Indeed, while "in a due process challenge to executive action the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience...," the "deliberate indifference that shocks in one environment may not be so patently egregious in another." County of Sacramento v. Lewis, 523 U.S. 833, 850, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998). "[A]n exact analysis of circumstances" is therefore necessary "before any abuse of power is condemned as conscience-shocking." Id.; Scheiber v. City of Philadelphia, 320 F.3d 409, 417-418 (3d Cir. 2003); Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999).

In Sanford v. Stiles, 456 F.3d 298, 304 (3d Cir. 2006), the Third Circuit endeavored to clarify the standard of fault in state-created danger cases. In that case, the plaintiff was the mother of a sixteen-year-old boy who committed suicide. In the

weeks preceding his death, Plaintiff's decedent had passed a note to his former girlfriend informing her that he had heard several rumors about her and another boy and indicating that one of the rumors he had heard "almost made me want to go kill myself."  The ex-girlfriend gave the note to the defendant guidance counselor who in turn promptly called the boy, Michael Sanford, into her office and interviewed him.  Michael told her that he was no longer upset about the situation with his former girlfriend, but he had been two months ago.  The counselor further asked him if he had any plans to hurt himself to which he replied "definitely not," and then asked him some "forward thinking" questions in an effort to determine if he had future plans and/or otherwise appeared to be in danger of harming himself.  Satisfied that the boy did not appear to be at risk, the counselor did not contact the school psychologist or his mother.  Roughly one week later, he returned to the counselor's office to ask who had given her the note, but the counselor told him she could not divulge that confidence to which he replied, "thanks, I thought that's what you would say."  Although the counselor testified that he did not seem to be upset during this conversation, he committed suicide that evening.

In suing her son's guidance counselor and the East Penn School District under §1983 alleging liability under the state created danger theory, Mrs. Sanford contended that Defendant

Stiles' actions "increased the risk that Michael would commit suicide" by, *inter alia*, "holding herself out as a source of aid to Michael, cutting off other possible avenues of help, undertaking an assessment of Michael without proper training, improperly evaluating his risk, and deciding not to contact the school psychologist or a parent." Sanford, 456 F.3d at 303, 305. Taking note that the standard of fault in state-created danger cases was an unsettled area of the law, and after a thorough review of its prior decisions in substantive due process cases in general and specifically under the state-created danger theory, the Third Circuit held:

> In conclusion, we hold that in a state-created danger case, when a state actor is not confronted with a "hyperpressurized environment" but nonetheless does not have the luxury of proceeding in a deliberate fashion, the relevant question is whether the officer consciously disregarded a great risk of harm. Again, it is possible that actual knowledge of the risk may not be necessary where the risk is "obvious."
>
> ...We again clarify that in *any* state-created danger case, the state actor's behavior must *always* shock the conscience. But what is required to meet the conscience-shocking level will depend upon the circumstances of each case, particularly the extent to which deliberation is possible. In some circumstances, deliberate indifference will be sufficient. In others, it will not.

Sanford, 456 F.3d at 310.

In applying all of the foregoing to the case at hand, we cannot find that the plaintiff has amassed sufficient evidence to make out a state-created danger claim against these defendants. Viewing the evidence in the light most favorable to the

plaintiff, it appears that Chief Sherman and Officers Eckman and Mossman knew that Sean Rhoad had been very recently discharged from a drug rehabilitation program when they asked him to assist them as a confidential informant, that as time went on it appeared that he was again using drugs and that both he and his parents told Chief Sherman and Officer Eckman that Sean couldn't or shouldn't continue as he needed to return to a drug treatment program.  Nevertheless, Officer Eckman told Sean that he could get help after he had completed his work with the task force. When Sean asked Officer Eckman to speak to the District Justice before whom his criminal charges were pending so that he could leave the state, Officer Eckman told him he needed to speak with Officer Kohl, the officer who had arrested him.  It further appears that through the efforts of plaintiff, his ex-wife and daughter, an out-of-state rehabilitation program was identified for Sean and that the Rhoad family was trying to secure what they believed to be a necessary change in the conditions of his bail so that he could enter that program.

Although we conclude that this evidence is sufficient to establish a relationship between the state and the plaintiff, and to demonstrate that Sean was at risk from his drug addiction, we can find absolutely no evidence to suggest that if he didn't receive that treatment he was likely to commit suicide.  Indeed, by his father's own testimony, on the day before his death, Sean

had worked a full day and seemed to be "on top of the world," because he had gotten his business cards with his name on them and he was handing them out to his friends and to customers. When his father dropped him at home after work that day, Sean had plans to go to a friend's house to watch the Eagles-Redskins game.  Although Sean had previously attempted suicide, that had been when he was eight years old and there is no evidence to indicate that any of the officers with whom he had been working had any knowledge of this; in fact, his father only learned of it after his death.  Thus, even applying the standard of culpability applicable to state actors who have the "luxury of proceeding in a deliberate fashion," we cannot find that Sean's death was foreseeable.

Furthermore, while we find that Officer Eckman's actions in handling Sean reflected indifference and were both cold and unprofessional, we do not find them to be "conscience shocking" or to quite rise to the level of deliberate indifference or willful disregard.[1]  Rather, given the facts known by the

---

[1]  Although the Courts have struggled to precisely define "willful disregard," the Third Circuit appears to define it co-extensively with "deliberate indifference," in that both "appear to fall somewhere between intent, which 'includes proceeding with knowledge that the harm is substantially certain to occur' and negligence, which involves 'the mere unreasonable risk of harm to another.'" Morse v. Lower Merion School District, 132 F.3d 902, 910, n. 10 (3d Cir. 1997); Mohammed ex rel Mohammed v. School District of Philadelphia, 335 F.Supp.2d 779, 784-785 (E.D.Pa. 2005). In the context of prison confinement actions brought under the Eighth Amendment, the Supreme Court has defined "deliberate indifference" to occur where the defendant knows that an inmate faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970, 1984, 128 L.Ed.2d 811 (1994).  In the context of municipal liability, the Court has defined

officers involved, we find they were at worst negligent in their treatment of Plaintiff's decedent.[2]   Likewise, despite the fact that Officer Eckman ill-advised Sean that he could only get help after he finished working as a confidential informant, such ill advice does not constitute such an affirmative use of his authority as to have created the danger or rendered the plaintiff's decedent more vulnerable to the danger that ultimately resulted in his demise.[3]   For these reasons, we find the evidence in this case to be insufficient to make out a state-created danger case.

We further note, that even assuming *arguendo* that the plaintiffs had produced adequate evidence to make out a state-created danger claim against the officers, the individual officers are not named as defendants in this action.  Instead, the only defendants named in this action are the Boroughs of

---

deliberate indifference as "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Kaucher, 455 F.3d at 427 n.4, quoting Board of County Commissioners v. Brown, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

[2]   Again, the record discloses involvement only of the following police officers: Chief Dee Sherman of the Spring City Police Department, Officers Glenn Eckman and William Mossman of the Phoenixville Police Department and Officer Kristin Lund of the West Whiteland Police Department.  As discussed *infra*, all of the above officers with the exception of Chief Sherman were evidently working with the plaintiff's decedent as part of a drug trafficking investigation by the Chester County Municipal Drug Task Force.

[3]   As Plaintiff testified, he didn't care whether his son signed papers to get out of his confidential informant work or not--it was his intention to get him out of the state and to get him the help that he needed.  Unlike the plaintiff in Kneipp, there is no evidence on this record that any of the officers involved isolated Sean Rhoad from his private sources of support and care and then abandoned him in the face of foreseeable harm.

Spring City and Phoenixville and East Vincent Township.

It is of course axiomatic that to make out a claim under Section 1983 against a municipal entity such as the defendants are here, the plaintiff must show that it was some custom, policy or practice of the municipality itself which caused the injury complained of. Monell v. New York City Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2027, 56 L.Ed.2d 611 (1978). This is because a municipality can not be held liable solely on the basis of its employees' or agent's actions under the doctrine of *respondeat superior*. Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997); Must v. West Hills Police Department, No. 03-4491, 2005 U.S. App. LEXIS 4504 at *15 (3d Cir. March 16, 2005). Stated otherwise, there must be evidence that the municipal action was taken with the requisite degree of culpability and that demonstrates a causal link between the municipal action and the deprivation of federal rights, *i.e.,* that municipal policymakers, acting with deliberate or reckless indifference, established or maintained a policy or well-settled custom[4] which caused a municipal employee to violate plaintiffs' constitutional rights and that such policy or custom was the

---

[4] "Policy" is said to be made when a decisionmaker possessing final authority to establish municipal policy with respect to an action issues an official proclamation, policy or edict. "Customs" are practices of state officials so permanent and well-settled as to virtually constitute law. Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000), quoting Pembaur v. City of Cincinnati, 475 U.S. 468, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), Monell, 436 U.S. at 691, 98 S.Ct. 2018; Kneipp, 95 F.3d at 1212.

moving force behind the constitutional tort. <u>Bryan County</u>, 520 U.S. at 404, 117 S.Ct. at 1388; <u>Padilla v. Township of Cherry Hill</u>, No. 03-3133, 110 Fed. Appx. 272, 278 (3d Cir. Oct. 5, 2004).

In this case, the record is wholly devoid of any evidence that Sean Rhoad's death was the result of a policy, custom or practice of any of the three defendant municipalities.  We note that Plaintiff's complaint does allege that his son's death was caused by deliberately indifferent policies and practices that introduced him into dangerous circumstances and locations without providing him with any training, failed to administer to his drug addiction, ignored his safety and mental health needs and failed to adequately train the police personnel with whom he was dealing on drug addiction and dependency and mental health issues.  The evidence produced reflects, however, that the policies of which Plaintiff complains and under which the officers were working were not the policies of the defendant municipalities but were the policies, practices and procedures of the Chester County Municipal Drug Task Force.  Thus, while we do find that a number of inadequacies in the areas claimed are reflected by this record, there is clearly no basis upon which the defendants named herein may be held liable for them.[5]

---

[5]  Supreme Court caselaw is clear that inadequate training can be the basis for §1983 liability in some limited circumstances.  <u>Bryan County</u>, 520 U.S. at 407, 117 S.Ct. at 1390; <u>City of Canton v. Harris</u>, 489 U.S. 378, 387, 109 S.Ct. 1197, 1204-1205, 103 L.Ed.2d 412 (1989).

For all of the foregoing reasons, all of the defendants' motions for summary judgment shall be granted in the attached order.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ESTATE OF SEAN WILLIAM RHOAD,  : CIVIL ACTION
Dec'd, by and through its      :
Administrator, GEORGE WILLIAM  :
RHOAD, JR.                     : NO. 05-CV-5875
                               :
        vs.                    :
                               :
EAST VINCENT TOWNSHIP,         :
BOROUGH OF SPRING CITY and     :
BOROUGH OF PHOENIXVILLE        :

### ORDER

AND NOW, this   10th    day of April, 2007, upon consideration of the Motions for Summary Judgment of Defendants East Vincent Township, Borough of Spring City and Borough of Phoenixville (Docket Nos. 25, 26 and 29), and Plaintiff's Responses thereto, it is hereby ORDERED that the Motions are GRANTED and Judgment as a Matter of Law is entered in favor of the Defendants on all remaining counts of the Plaintiff's complaint for the reasons set forth in the preceding Memorandum Opinion.

                                        BY THE COURT:


                                        /s/ J. Curtis Joyner
                                        J. CURTIS JOYNER,      J.

18